# EXHIBIT A

E-FILED; Cecil Circuit Court
Docket: 4/23/2026 12:29 PM; Submission: 4/23/2026 12:29 PM
Envelope: 26155472

| | | |
|---|---|---|
| **JAMES A. GIORDANO**<br>451 Eaton Way<br>West Chester PA 19380 | * <br>* | **IN THE** |
| **JOHN J. ALESSANDRINI**<br>2307 Mousley Place<br>Wilmington DE 19810 | * <br>* | **CIRCUIT COURT**<br><br>**FOR** |
| **KAYDIN K. AMBROSE**<br>18 Wallace Road<br>Hampton VA 23664 | * <br>* | **CECIL COUNTY** |
| **FRANCIS C. BANKS III**<br>636 Main Street<br>Odessa DE 19730 | * <br>* | **CASE NO.** C-07-CV-26-000174 |
| **ANGELA L. BOOTH**<br>7601 Lost Tree Road<br>Wilmington NC 28411 | * <br>* | |
| **ALFRED A. CLEMENTE**<br>303 Llangollen Boulevard<br>New Castle DE 19720 | * <br>* | |
| **MARC D. CONTRADY**<br>9 Hathaway Court<br>New Castle DE 19720 | * <br>* | |
| **BETTY J. ELLWOOD**<br>255 Cocoa Cay Lane<br>Bear DE 19701 | * <br>* | |
| **JANET J. FOWLER**<br>22 Kavanaugh Cors<br>Bombay NY 12914 | * <br>* | |
| **BENTON L. GARRISON**<br>52 Anglin Drive<br>Newark DE 19713 | * <br>* | |
| **PAUL GREGG**<br>2730 Red Cedar Parc Drive S<br>O'Fallon MO 63668 | * <br>* | |

**WILLIAM KARL HARRINGTON** *
1906 Harwyn Road
Wilmington DE 19810 *

**SHAWN E. KEYS SR.** *
2411 Calf Run Drive
Wilmington DE 19808 *

**THOMAS S. LASICH** *
E2376 State Highway M-28
Au Train MI 49806 *

**COREY L. MADDREY** *
55 Boxelder Lane
Bear DE 19701 *

**DEBORAH L. McGRORY** *
1816 Twin Rivers Trail
Parrish FL 34219 *

**GRANVILLE R. MORRIS** *
5305 San Antonio Avenue, Apt. 227
Orlando FL 32839 *

**KEITH S. MROZ** *
3046 Arrowroot Way
Indianapolis IN 46239 *

**ELIZABETH F. OWENS** *
1 Rambleton Drive, Apt. C-8
New Castle DE 19720 *

**JOHN P. PALETAR** *
9443 Rolling Green Drive
Delmar MD 21875 *

**LORIE C. PAULIN** *
308 Cobble Creek Curve
Newark DE 19702 *

**FLORENCEANNE K. POWELL-TUCKER** *
812 Tremont Street
New Castle DE 19720 *

**JOHN M. PRICE** *
28 Hodgkins Place
New Castle DE 19720 *

**KENNETH J. RAIA** *
2 Old Flint Circle
Hockessin DE 19707 *

**DALE M. ROBERTS** *
3127 Wrangle Hill Road
Bear DE 19701 *

**CELESTEEN SCOTT** *
533 Saienni Boulevard
New Castle DE 19720 *

**TYNESIA M. STEWART** *
123 Redden Lane
Middletown DE 19709 *

**THOMAS C. TUITES** *
222 Fenwick Avenue
Wilmington DE 19804 *

**NORTH E. WEST** *
133 Collingsworth Lane
Tazewell TN 37879 *

**RONLEY G. WHITE** *
11267 Midpoint Drive
New Orleans LA 70128 *

***and*** *

**RATASHI WILLIAMS GEORGE** *
1937 Prospect Avenue, E-201
Cleveland OH 44115 *

***Plaintiffs,*** *

***v.*** *

**W. L. GORE & ASSOCIATES, INC.** *
555 Paper Mill Road
Newark DE 19711 *
***Serve on Resident Agent:***
**The Corporation Trust Inc.** *
2405 York Road, Suite 201
Lutherville MD 21093-2264 *

***Defendant.*** *

* * * * * * * * * * * * * * * * * * * *

**COMPLAINT WITH INDIVIDUAL CLAIMS**
**AND DEMAND FOR JURY TRIAL**

**NOW COME** Plaintiffs, JAMES A. GIORDANO; JOHN J. ALESSANDRINI; KAYDIN K. AMBROSE; FRANCIS C. BANKS III; ANGELA L. BOOTH; ALFRED A. CLEMENTE; MARC D. CONTRADY; BETTY J. ELLWOOD; JANET J. FOWLER; BENTON L. GARRISON; PAUL GREGG; WILLIAM KARL HARRINGTON; SHAWN E. KEYS, SR.; THOMAS S. LASICH; COREY L. MADDREY; DEBORAH L. McGRORY; GRANVILLE R. MORRIS; KEITH S. MROZ; ELIZABETH F. OWENS; JOHN P. PALETAR; LORIE C. PAULIN; FLORENCEANNE K. POWELL-TUCKER; JOHN M. PRICE; KENNETH J. RAIA; DALE M. ROBERTS; CELESTEEN SCOTT; TYNESIA M. STEWART; THOMAS C. TUITES; NORTH E. WEST; RONLEY G. WHITE; *and* RATASHI WILLIAMS GEORGE (collectively "Plaintiffs"), by and through undersigned counsel, and complaining of the Defendant W. L. GORE & ASSOCIATES, INC. ("Gore" or "Defendant"), hereby allege and state as follows:

# THE PARTIES

## A. Categories of Plaintiffs

1. Those Plaintiffs bringing claims for personal injuries are identified as "Personal Injury Plaintiffs" and are referred to as such throughout this Complaint.

2. Those Plaintiffs bringing claims for medical monitoring are identified as "Medical Monitoring Plaintiffs" and are referred to as such throughout this Complaint.

3. Those Plaintiffs bringing claims for property damage are identified as "Property Damages Plaintiffs" and are referred to as such throughout this Complaint.

## B. Plaintiffs

4. **Plaintiff JAMES A. GIORDANO** is an adult individual who resides at 451 Eaton Way, West Chester PA 19380. Plaintiff previously resided in New Castle County DE. During such residency, Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels of PFAS allowed bioaccumulation of PFAS in Plaintiff's blood. As a direct and proximate result of this exposure, Plaintiff has been diagnosed with injuries including Kidney Cancer. Plaintiff joins in all claims of the *Personal Injury Plaintiffs* and the *Medical Monitoring Plaintiffs*.

5. **Plaintiff JOHN J. ALESSANDRINI** is an adult individual who resides at 2307 Mousley Place, Wilmington DE 19810. Plaintiff currently resides and previously resided in New Castle County DE. During such residency, Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community.

Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels of PFAS allowed bioaccumulation of PFAS in Plaintiff's blood. As a direct and proximate result of this exposure, Plaintiff has been diagnosed with injuries including Liver Cancer. Plaintiff joins in all claims of the *Personal Injury Plaintiffs* and the *Medical Monitoring Plaintiffs*.

6. **Plaintiff KAYDIN K. AMBROSE** is an adult individual who resides at 18 Wallace Road, Hampton VA 23664. Plaintiff previously resided in New Castle County DE. During such residency, Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels of PFAS allowed bioaccumulation of PFAS in Plaintiff's blood. As a direct and proximate result of this exposure, Plaintiff has been diagnosed with injuries including Thyroid Disease. Plaintiff joins in all claims of the *Personal Injury Plaintiffs* and the *Medical Monitoring Plaintiffs*.

7. **Plaintiff FRANCIS C. BANKS III** is an adult individual who resides at 636 Main Street, Odessa DE 19730. Plaintiff currently resides in New Castle County DE and previously resided in Cecil County MD and New Castle County DE. During such residency, Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels of PFAS allowed bioaccumulation of PFAS in

Plaintiff's blood. As a direct and proximate result of this exposure, Plaintiff has been diagnosed with injuries including Kidney Cancer. Plaintiff joins in all claims of the *Personal Injury Plaintiffs* and the *Medical Monitoring Plaintiffs*.

8. **Plaintiff ANGELA L. BOOTH** is an adult individual who resides at 7601 Lost Tree Road, Wilmington NC 28411. Plaintiff previously resided in New Castle County DE. During such residency, Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels of PFAS allowed bioaccumulation of PFAS in Plaintiff's blood. As a direct and proximate result of this exposure, Plaintiff has been diagnosed with injuries including Thyroid Disease. Plaintiff joins in all claims of the *Personal Injury Plaintiffs* and the *Medical Monitoring Plaintiffs*.

9. **Plaintiff ALFRED A. CLEMENTE** is an adult individual who resides at 303 Llangollen Boulevard, New Castle DE 19720. Plaintiff currently resides and previously resided in New Castle County DE. During such residency, Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels of PFAS allowed bioaccumulation of PFAS in Plaintiff's blood. As a direct and proximate result of this exposure, Plaintiff has been diagnosed with injuries including Kidney

Cancer. Plaintiff joins in all claims of the *Personal Injury Plaintiffs* and the *Medical Monitoring Plaintiffs.*

10. **Plaintiff MARC D. CONTRADY** is an adult individual who resides at 9 Hathaway Court, New Castle DE 19720. Plaintiff currently resides and previously resided in New Castle County DE. During such residency, Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels of PFAS allowed bioaccumulation of PFAS in Plaintiff's blood. As a direct and proximate result of this exposure, Plaintiff has been diagnosed with injuries including Testicular Cancer and Thyroid Disease. Plaintiff joins in all claims of the *Personal Injury Plaintiffs* and the *Medical Monitoring Plaintiffs*.

11. **Plaintiff BETTY J. ELLWOOD** is an adult individual who resides at 255 Cocoa Cay Lane, Bear DE 19701. Plaintiff currently resides in New Castle County DE and previously resided in Cecil County MD and New Castle County DE. During such residency, Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels of PFAS allowed bioaccumulation of PFAS in Plaintiff's blood. As a direct and proximate result of this exposure, Plaintiff has been diagnosed

with injuries including Thyroid Disease. Plaintiff joins in all claims of the *Personal Injury Plaintiffs* and the *Medical Monitoring Plaintiffs*.

12. **Plaintiff JANET J. FOWLER** is an adult individual who resides at 22 Kavanaugh Cors, Bombay NY 12914. Plaintiff previously resided in New Castle County DE. During such residency Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels of PFAS allowed bioaccumulation of PFAS in Plaintiff's blood. As a direct and proximate result of this exposure, Plaintiff has been diagnosed with injuries including Thyroid Disease. Plaintiff joins in all claims of the *Personal Injury Plaintiffs* and the *Medical Monitoring Plaintiffs*.

13. **Plaintiff BENTON L. GARRISON** is an adult individual who resides at 52 Anglin Drive, Newark DE 19713. Plaintiff currently resides and previously resided in New Castle County DE. During such residency Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels of PFAS allowed bioaccumulation of PFAS in Plaintiff's blood. As a direct and proximate result of this exposure, Plaintiff has been diagnosed with injuries including Thyroid Disease. Plaintiff joins in all claims of the *Personal Injury Plaintiffs*, the *Medical Monitoring Plaintiffs*, and the *Property Damage Plaintiffs*.

14. **Plaintiff PAUL GREGG** is an adult individual who resides at 2730 Red Cedar Parc Drive S, O'Fallon MO 63368. Plaintiff previously resided in New Castle County DE. During such residency Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels of PFAS allowed bioaccumulation of PFAS in Plaintiff's blood. As a direct and proximate result of this exposure, Plaintiff has been diagnosed with injuries including Thyroid Disease. Plaintiff joins in all claims of the *Personal Injury Plaintiffs* and the *Medical Monitoring Plaintiffs*.

15. **Plaintiff WILLIAM KARL HARRINGTON** is an adult individual who resides at 1906 Harwyn Road, Wilmington DE 19810. Plaintiff currently resides in New Castle County DE and previously resided in Cecil County MD and New Castle County DE. During such residency Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels of PFAS allowed bioaccumulation of PFAS in Plaintiff's blood. As a direct and proximate result of this exposure, Plaintiff has been diagnosed with injuries including Kidney Cancer. Plaintiff joins in all claims of the *Personal Injury Plaintiffs* and the *Medical Monitoring Plaintiffs*.

16. **Plaintiff SHAWN E. KEYS, SR.** is an adult individual who resides at 2411 Calf Run Drive, Wilmington DE 19808. Plaintiff currently resides and previously resided in New Castle

County DE. During such residency Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels of PFAS allowed bioaccumulation of PFAS in Plaintiff's blood. As a direct and proximate result of this exposure, Plaintiff has been diagnosed with injuries including Kidney Cancer. Plaintiff joins in all claims of the *Personal Injury Plaintiffs* and the *Medical Monitoring Plaintiffs.*

17. **Plaintiff THOMAS S. LASICH** is an adult individual who resides at E2376 State Highway M-28, Au Train MI 49806. Plaintiff previously resided in Cecil County MD and New Castle County DE. During such residency Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels of PFAS allowed bioaccumulation of PFAS in Plaintiff's blood. As a direct and proximate result of this exposure, Plaintiff has been diagnosed with injuries including Kidney Cancer. Plaintiff joins in all claims of the *Personal Injury Plaintiffs* and the *Medical Monitoring Plaintiffs*.

18. **Plaintiff COREY L. MADDREY** is an adult individual who resides at 55 Boxelder Lane, Bear DE 19701. Plaintiff currently resides and previously resided in New Castle County DE. During such residency, Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community. Plaintiff

was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels of PFAS allowed bioaccumulation of PFAS in Plaintiff's blood. As a direct and proximate result of this exposure, Plaintiff has been diagnosed with injuries including Kidney Cancer. Plaintiff joins in all claims of the *Personal Injury Plaintiffs* and the *Medical Monitoring Plaintiffs*.

19. **Plaintiff DEBORAH L. McGRORY** is an adult individual who resides at 1816 Twin Rivers Trail, Parrish FL 34219. Plaintiff previously resided in New Castle County DE. During such residency Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels of PFAS allowed bioaccumulation of PFAS in Plaintiff's blood. As a direct and proximate result of this exposure, Plaintiff has been diagnosed with injuries including Thyroid Cancer and Ulcerative Colitis. Plaintiff joins in all claims of the *Personal Injury Plaintiffs* and the *Medical Monitoring Plaintiffs.*

*20.* **Plaintiff GRANVILLE R. MORRIS** is an adult individual who resides at 5305 San Antonio Avenue, Apt. 227, Orlando FL 32839. Plaintiff previously resided in New Castle County DE. During such residency Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels

of PFAS allowed bioaccumulation of PFAS in Plaintiff's blood. As a direct and proximate result of this exposure, Plaintiff has been diagnosed with injuries including Kidney Cancer and Ulcerative Colitis. Plaintiff joins in all claims of the *Personal Injury Plaintiffs* and the *Medical Monitoring Plaintiffs.*

21. **Plaintiff KEITH S. MROZ** is an adult individual who resides at 3046 Arrowroot Way, Indianapolis IN 46239. Plaintiff previously resided in New Castle County DE. During such residency Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels of PFAS allowed bioaccumulation of PFAS in Plaintiff's blood. As a direct and proximate result of this exposure, Plaintiff has been diagnosed with injuries including Testicular Cancer. Plaintiff joins in all claims of the *Personal Injury Plaintiffs* and the *Medical Monitoring Plaintiffs*.

*22.* **Plaintiff ELIZABETH F. OWENS** is an adult individual who resides at 1 Rambleton Drive, Apt. C-8, New Castle DE 19720. Plaintiff currently resides and previously resided in New Castle County DE. During such residency Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels of PFAS allowed bioaccumulation of PFAS in Plaintiff's blood. As a direct and proximate result of this exposure, Plaintiff has been diagnosed with injuries including

Ulcerative Colitis. Plaintiff joins in all claims of the *Personal Injury Plaintiffs* and the *Medical Monitoring Plaintiffs.*

23. **Plaintiff JOHN P. PALETAR** is an adult individual who resides at 9443 Rolling Green Drive, Delmar MD 21875. Plaintiff previously resided in Cecil County MD and New Castle County DE. During such residency Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels of PFAS allowed bioaccumulation of PFAS in Plaintiff's blood. As a direct and proximate result of this exposure, Plaintiff has been diagnosed with injuries including Testicular Cancer. Plaintiff joins in all claims of the *Personal Injury Plaintiffs* and the *Medical Monitoring Plaintiffs*.

24. **Plaintiff LORIE C. PAULIN** is an adult individual who resides at 308 Cobble Creek Curve, Newark DE 19702. Plaintiff currently resides and previously resided in New Castle County DE. During such residency Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels of PFAS allowed bioaccumulation of PFAS in Plaintiff's blood. As a direct and proximate result of this exposure, Plaintiff has been diagnosed with injuries including Thyroid Disease. Plaintiff joins in all claims of the *Personal Injury Plaintiffs* and the *Medical Monitoring Plaintiffs*.

*25.* **Plaintiff FLORENCEANNE K. POWELL-TUCKER** is an adult individual who resides at 812 Tremont Street, New Castle DE 19720. Plaintiff currently resides and previously resided in New Castle County DE. During such residency, Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels of PFAS allowed bioaccumulation of PFAS in Plaintiff's blood. As a direct and proximate result of this exposure, Plaintiff has been diagnosed with injuries including Thyroid Cancer and Thyroid Disease. Plaintiff joins in all claims of the *Personal Injury Plaintiffs* and the *Medical Monitoring Plaintiffs.*

*26.* **Plaintiff JOHN M. PRICE** is an adult individual who resides at 28 Hodgkins Place, New Castle DE 19720. Plaintiff currently resides and previously resided in New Castle County DE. During such residency Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels of PFAS allowed bioaccumulation of PFAS in Plaintiff's blood. As a direct and proximate result of this exposure, Plaintiff has been diagnosed with injuries including Thyroid Disease. Plaintiff joins in all claims of the *Personal Injury Plaintiffs* and the *Medical Monitoring Plaintiffs.*

27. **Plaintiff KENNETH J. RAIA** is an adult individual who resides at 2 Old Flint Circle, Hockessin DE 19707. Plaintiff currently resides in New Castle County DE. During such

residency, Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels of PFAS allowed bioaccumulation of PFAS in Plaintiff's blood. As a direct and proximate result of this exposure, Plaintiff has been diagnosed with injuries including Kidney Cancer. Plaintiff joins in all claims of the *Personal Injury Plaintiffs* and the *Medical Monitoring Plaintiffs*.

28. **Plaintiff DALE M. ROBERTS** is an adult individual who resides at 3127 Wrangle Hill Road, Bear DE 19701. Plaintiff currently resides and previously resided in New Castle County DE. During such residency Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels of PFAS allowed bioaccumulation of PFAS in Plaintiff's blood. As a direct and proximate result of this exposure, Plaintiff has been diagnosed with injuries including Kidney Cancer. Plaintiff joins in all claims of the *Personal Injury Plaintiffs* and the *Medical Monitoring Plaintiffs.*

29. **Plaintiff CELESTEEN SCOTT** is an adult individual who resides at 533 Saienni Boulevard, New Castle DE 19720. Plaintiff currently resides and previously resided in New Castle County DE. During such residency Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community. Plaintiff

was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels of PFAS allowed bioaccumulation of PFAS in Plaintiff's blood. As a direct and proximate result of this exposure, Plaintiff has been diagnosed with injuries including Kidney Cancer. Plaintiff joins in all claims of the *Personal Injury Plaintiffs* and the *Medical Monitoring Plaintiffs*.

30. **Plaintiff TYNESIA M. STEWART** is an adult individual who resides at 123 Redden Lane, Middletown DE 19709. Plaintiff currently resides in New Castle County DE and previously resided in Cecil County MD and New Castle County DE. During such residency Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels of PFAS allowed bioaccumulation of PFAS in Plaintiff's blood. As a direct and proximate result of this exposure, Plaintiff has been diagnosed with injuries including Thyroid Cancer and Thyroid Disease. Plaintiff joins in all claims of the *Personal Injury Plaintiffs* and the *Medical Monitoring Plaintiffs.*

*31.* **Plaintiff THOMAS C. TUITES** is an adult individual who resides at 222 Fenwick Avenue, Wilmington DE 19804. Plaintiff currently resides and previously resided in New Castle County DE. During such residency Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels

of PFAS allowed bioaccumulation of PFAS in Plaintiff's blood. As a direct and proximate result of this exposure, Plaintiff has been diagnosed with injuries including Kidney Cancer. Plaintiff joins in all claims of the *Personal Injury Plaintiffs*, the *Medical Monitoring Plaintiffs*, and the *Property Damage Plaintiffs.*

32. **Plaintiff NORTH E. WEST** is an adult individual who resides at 133 Collingsworth Lane, Tazewell TN 37879. Plaintiff previously resided in New Castle County DE. During such residency Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels of PFAS allowed bioaccumulation of PFAS in Plaintiff's blood. As a direct and proximate result of this exposure, Plaintiff has been diagnosed with injuries including Thyroid Disease. Plaintiff joins in all claims of the *Personal Injury Plaintiffs* and the *Medical Monitoring Plaintiffs*.

33. **Plaintiff RONLEY G. WHITE** is an adult individual who resides at 11267 Midpoint Drive, New Orleans LA 70128. Plaintiff previously resided in New Castle County DE. During such residency Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels of PFAS allowed bioaccumulation of PFAS in Plaintiff's blood. As a direct and proximate result of this

exposure, Plaintiff has been diagnosed with injuries including Kidney Cancer. Plaintiff joins in all claims of the *Personal Injury Plaintiffs* and the *Medical Monitoring Plaintiffs*.

34. **Plaintiff RATASHI WILLIAMS GEORGE** is an adult individual who resides at 1937 Prospect Avenue, E-201, Cleveland OH 44115. Plaintiff previously resided in New Castle County DE. During such residency Plaintiff was exposed to PFAS by multiple sources including regularly consuming drinking water containing elevated levels of PFAS, and/or being exposed to PFAS in the air soil and/or water located at Plaintiff's residence and in the community. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to Plaintiff's health. Plaintiff's exposure to elevated levels of PFAS allowed bioaccumulation of PFAS in Plaintiff's blood. As a direct and proximate result of this exposure, Plaintiff has been diagnosed with injuries including Ulcerative Colitis. Plaintiff joins in all claims of the *Personal Injury Plaintiffs* and the *Medical Monitoring Plaintiffs*.

**C. <u>Defendant W. L. Gore & Associates, Inc.</u>**

35. **Defendant W. L. GORE & ASSOCIATES, INC.** is a Delaware Corporation with its principal place of business located at 555 Paper Mill Road, Newark DE 19711. Gore is authorized to conduct business within the State of Maryland. Gore's registered agent for service in the state of Maryland is: The Corporation Trust, Inc., 2405 York Road, Suite 201, Lutherville MD 21093-2264.

36. Gore is the owner and operator of an industrial property, comprised of approximately 20.78 acres of improved real property located in Elkton, Maryland with a mailing address of 2401 Singerly Road, Elkton MD 21921 (the "Cherry Hill Facility" or "Cherry Hill").

37. Gore is the owner and operator of an industrial property, comprised of approximately 75 acres of improved real property located in Elkton, Maryland with a mailing address of 100 Airport Road, Elkton MD 21921 (the "Appleton Facilities" or the "Appleton

complex"). According to public records, this 75-acre parcel, located at plat number MS3524 (Cecil County, Maryland), comprises four free-standing Gore facilities, known as: "Appleton North," "Appleton East," "Appleton Central," and "Appleton South."

38. Gore is the owner and operator of an industrial property, comprised of approximately 22 acres of improved real property located in Elkton, Maryland with a mailing address of 101 Lewisville Road, Elkton MD 21921 (the "Fair Hill Facility" or "Fair Hill").

39. Upon information and belief, Gore currently operates and has been operating for the duration of time relevant to the allegations in this complaint, the Cherry Hill, Appleton, and Fair Hill Facilities (collectively, "the Facilities") under the same or substantively similar company protocols, including air emissions, manufacturing guidelines, safety measures, and hazardous and non-hazardous waste disposal.

40. Gore is a privately held, multinational manufacturing and materials science company, with annual revenues of $4.8 billion. Gore specializes in the development of membrane and polymer and fluoropolymer products, as well as their manufacture and application to a variety of industries and sectors, including healthcare, life sciences, mobile electronics, automotive, textiles and apparel, and aerospace. This includes "Gore-Tex" fabric.

41. According to Gore's website[1]:

> At Gore, we believe that the integrity of environmental, health and safety performance aligns with our Gore brand promise of *Together, improving life* for all Gore Associates, customers and the communities we serve. We carefully consider the effects of our products and operations on the environment, as well as on the health and well-being of people. We are committed to using our materials science expertise to create products that improve the quality of life and address sustainability challenges for generations to come. Our expectation is that the value of our innovations is greater than the environmental and social impact of our products and operations.[2]

---

[1] https://www.gore.com/about/the-gore-story?view=responsible-enterprise.

[2] https://www.gore.com/about/the-gore-story?view=responsible-enterprise.

42. At all times relevant to the facts and allegations set forth herein, Gore: (a) maintained licenses and registrations to do business in the State of Maryland; (b) regularly conducted business in the State of Maryland; (c) maintained continuous and systematic contacts with the State of Maryland; (d) committed acts and/or omissions within the State of Maryland which gave rise to the instant action; (e) injected their products and/or materials into the stream of commerce within the State of Maryland; and/or (f) acted as one entity with a parent or subsidiary which, at all times relevant to the facts and allegations set forth herein, had continuous and systematic contacts with the State of Maryland.

## JURISDICTION AND VENUE

43. The state law claims asserted in this Complaint are brought pursuant to Maryland common law.

44. This Court has personal jurisdiction over Defendant, as Defendant caused tortious injury in the State of Maryland, performed acts or omissions within the State of Maryland which caused such tortious injury, regularly conducts and/or solicits business within the State of Maryland, engages in other persistent courses of conduct in the State of Maryland, and/or derives substantial revenue from goods, services, and/or manufactured products used and consumed within the State of Maryland.

## GENERAL FACTUAL ALLEGATIONS

### A. Background Regarding PFOA, APFO and Use in the Creation of Gore's PTFE and ePTFE

45. At all times relevant to the allegations asserted herein, Gore was divided into at least three divisions: fabrics, medical products, and electronic/industrial products.

46. Though these divisions worked across various disparate sectors, upon information and belief, Gore used PTFE fine powder as a starting point in nearly all of its products for some time after its discovery of ePTFE in 1968.

47. This discovery made Gore a leader within the polymer industry, and, as a result, Gore grew rapidly in the 70s, 80s, and 90s.

48. Polymers are substances with molecular structures consisting chiefly, or entirely, of large numbers of similar units bonded together, such as synthetic organic materials used as plastics or resins.

49. Fluoropolymers are fluorocarbon-based polymers with multiple carbon fluorine bonds, which are characterized by a high resistance to solvents, acids, and bases, making them ideal for use in waterproof products, such as Gore-Tex fabric.

50. Many of Gore's most important and lucrative products are based on a fluoropolymer called polytetrafluoroethylene ("PTFE"), otherwise known as Teflon®, which Gore uses to create thousands of different products and applications; notably, the EPA lists PTFE under its master list of PFAS substances.

51. In connection with Gore's PTFE manufacturing processes, it processes material comprising additional dangerous PFASs. Moreover, in some cases, Gore uses, and has used, additional dangerous toxic PFAS compounds as a component part of its manufacturing processes.

52. PFAS are a large group of thousands of chemicals compounds, including but not limited to ammonium perfluorooctanoate ("APFO"), perfluorooctanoate ("PFO"), perfluorooctanoic sulfonic acid ("PFOS"), and perfluorooctanoic acid ("PFOA"), colloquially known as ("C8").

53. Due to their chemical structure, PFAS are biologically and chemically stable in the environment and resistant to environmental degradation processes, and thus remain present in the environment long after they are initially released.

54. PFAS bioaccumulate in living organisms, primarily in the blood serum, kidney, and liver, and remain in the human body.

55. PFOA is a fluorinated organic chemical that is part of a larger group of chemicals referred to throughout this Complaint as PFAS or perfluorochemical compounds (PFCs). This group of compounds also includes PFOS.

56. PFOA, and all PFCs, are human-made chemicals that are not found in nature. The ammonium salt form of PFOA, APFO, is highly water soluble and its particulate matter quickly and easily dissolves into rainwater and other precipitation to form PFO- or PFOA, which then readily percolates down through soils to contaminate groundwater.

57. APFO is the ammonium salt form of PFOA. It dissociates in water to form PFO- and is protonated to form PFOA.[3]

58. APFO acts as a "surfactant" or "emulsifier"—a chemical additive which is used to create high molecular weight PTFE, and which enables the PTFE particles to be suspended in water.

59. Generally, surfactants and emulsifiers like APFO are chemical compounds that act as wetting agents, lowering surface tension between gasses and liquids and reducing the volatility of chemical reactions, thereby allowing for chemical reactions which are otherwise difficult to achieve. These are mixed with large reactor vessels or basins to form PTFE.

[3] For purposes of this Complaint, APFO, PFO and PFOA will all be variably referred to as "PFOA".

60. APFO, introduced as the surfactant/emulsifier, takes the physical form of a white powder/white solid at ambient temperature. When added to water, it takes the form of a soapy, detergent-like liquid, utilized in the process of creating PTFE. This process is called aqueous dispersion polymerization.

61. When APFO is released to the environment and interacts with aqueous solution in the environment, it undergoes an immediate chemical reaction which converts it to PFOA. When APFO enters the human body, such as via inhalation of APFO air emissions, a similar chemical reaction occurs.

62. APFO/PFOA exists as a vapor when heated during the process of PTFE as well as FEP (fluorinated ethylene propylene) manufacturing and coating. When PTFE coatings are heated, APFO/PFOA vaporizes out of the PTFE dispersion and exits through stacks in manufacturing facilities. When hot PFOA vapor exits through the stacks, it cools and coagulates within minutes to form micro-sized particulates ranging from 0.1 µm to 1 µm in diameter that are then carried by the wind until they settle to the ground (dry deposition) or are washed by precipitation (wet deposition).

63. Gore gained notoriety for its efforts in further stretching and expanding post-extrusion PTFE, thereby orienting the web-like molecules and making the PTFE even stronger and more durable.

64. Stretched and expanded PTFE is referred to as "ePTFE".

65. While ePTFE's oriented, web-like structure is ideal for high-strength applications, its porous structure also enables applications involving filtration and breathability.

66. Moreover, due to its chemical structure, PTFE and ePTFE are biologically and chemically stable and are largely resistant to degradation. Such bio-retentive, bio-accumulative,

and bio-persistent characteristics make PTFE and ePTFE ideal components of strong, durable consumer products.

67. In March of 1995, Gore expanded its prior utilization of APFO as a surfactant in the production of its PTFE and ePTFE.

68. Upon information and belief, Gore utilized materials comprised of post-polymerization PTFE waste scraped from polymerization vessels at a separate PFAS manufacturing facility and recycled for use by Gore.

69. Upon information and belief, this material contained staggering levels of C8, including approximately 10% raw APFO.

70. At this time, Gore was well aware of the toxic nature of APFO/PFOA, and that this material contained a substantially higher level of raw PFOA than proportions of surfactants previously introduced and utilized at Gore.

71. Gore also knew, at this time, that heating even the smallest quantities of the new material in the testing or production process to temperatures appropriate for ePTFE membranes would result in extreme PFOA emissions.

72. For a period of many years following 1995, Gore directed its employees to purchase large quantities of this material to utilize in testing and production.

73. For a period of many years, Gore directed its employees to perform testing and production processes utilizing the material containing 10% raw PFOA, which resulted in substantial toxic environmental exposures to the surrounding community, including to Plaintiffs.

74. Gore represented to its employees that the new material was harmless.

75. In approximately the fall of 1996, new material was no longer available for purchase by Gore.

76. Despite this knowledge, Gore instructed its employees from the fall of 1996 through the year 1997 to continue utilizing the large quantities of the new material it had already purchased.

**B. <u>Toxicity of PTFE and ePTFE products developed with APFO/PFOA</u>**

77. While PTFE and ePTFE possess commercially desirable physical characteristics related to strength and durability, PFOA used in the manufacture of PTFE and ePTFE is highly carcinogenic and otherwise toxic and/or harmful to human beings (and other living creatures) who inhale, ingest, or otherwise absorb PFOA.

78. Specifically, PFOA is readily absorbed after ingestion or inhalation exposure, binds to albumen in an individual's blood serum, and is concentrated in the liver and kidneys.

79. When released into the environment, PFOA is also particularly persistent in water and soil and, because of its solubility in water, can readily migrate from soil to groundwater.

80. Moreover, due to its resistance to biodegradation, hydrolysis and photolysis and high resistance to virtually all methods of traditional purification and/or eradication, PFOA remains in the environment—and in the human body—long after its initial discharge and/or consumption/absorption.

81. PFOA is especially concerning from a human health standpoint precisely because it can stay in the environment and in the human body for long periods of time.

82. Myriad health risks associated with exposure to PFOA exist, and such risks are present even when PFOA is ingested at, seemingly, very low levels (less than 0.004 part per trillion (ppt)).

83. Specifically, PFOA is associated with, inter alia, increased risk in humans of testicular cancer, kidney cancer, prostate cancer, endometrial/uterine cancer, breast cancer, along with thyroid disease, ulcerative colitis, polycystic ovary syndrome ("PCOS"), pregnancy-induced

hypertension, Type-2 diabetes in women, pre-eclampsia, developmental delays in children, and other health conditions.

84. Upon information and belief, PFOA has the ability to cause other cancers and illnesses not yet associated with human exposure.

## C. History of PFAS Industry Use, and Production of PFAO-containing Products and Knowledge of Toxicity

### i. The 1970s: Gore Begins Processing PTFE Products at the Facilities

85. Gore began processing PFOA-containing PTFE products at the identified Facilities in the early 1970s.

86. Gore: (a) purchased PTFE resin and aqueous PTFE and FEP dispersions containing high amounts of PFOA and/or APFO for use in Gore's manufacturing processes and later (b) created and/or used raw PFOA and/or APFO to create its own PTFE aqueous dispersions and resins for use in manufacturing. Upon information and belief, Gore spent hundreds of millions of dollars to purchase thousands of tons of PTFE resin each year until it began its own production.

87. When Gore began manufacturing its own PTFE resin from aqueous dispersions, including applications which utilized raw APFO as a surfactant or wetting agent, it also sold, traded, and provided PTFE resin to other manufacturers.

88. Gore utilized PFOA and PFOA containing fluoropolymers to make, among other things, carpets, clothing, fabrics for furniture, paper packaging for food, and other materials such as cookware that are resistant to water, grease, or stains.

89. In 2006, the United States Environmental Protection Agency ("EPA") implemented a global stewardship program that included eight major perfluoroalkyl manufacturing companies. The stewardship program's goal was (i) to achieve a 95% reduction of global facility emissions of PFOA and chemicals that degrade to PFOA by 2010, and (ii) to eliminate PFOA from emissions

and products by 2015. According to EPA, all eight companies that participated in the program have attested that they phased out PFOA, and chemicals that degrade to PFOA, from emissions and products by the end of 2015. However, Gore was not one of these companies.

90. There are a number of health risks associated with exposure to PFOA, and these risks are present even when PFOA is ingested at, seemingly, very low levels (0.004 parts per trillion (ppt)).

91. PFAS manufacturers became aware of the toxicity of PFOA in the 1950s and began researching the potential health effects associated with the compound.

92. A study published in or about 1961 found that PFAS induced a range of toxic effects, including inhibition of enzymes, metabolic effects, and effects on blood pressure and the sympathetic nervous system.

93. PFAS manufacturers knew by the 1970s, at the latest, that PFAS were widely present in human blood and were not easily removed from the body or bloodstream.

94. In 1976, two academic researchers published a report that showed widespread contamination of human tissues in non-occupationally exposed persons with organofluorine compounds (organic compounds that contain the carbon-fluorine bond) which were likely derived from commercial sources such as PFOA. The authors questioned whether consumer products containing these compounds could be the source, but PFAS manufacturers pled ignorance and instructed them not to speculate.

95. In the late 1970s, the PFAS industry began monitoring the effect of occupational exposure to PFAS on the health of employees working in PFAS manufacturing facilities.

96. Despite observing indications of ill-health effects in their employees who were exposed to PFAS, PFAS manufacturers agreed not to notify the EPA of these findings under

Section 8(e) of the Toxic Substances Control Act because there were no established adverse health effects associated with their findings.

97. Around the same time, the PFAS industry was conducting studies in laboratory animals that demonstrated dangerous health effects associated with exposure to PFOA, including, but not limited to: 1) liver enlargement and death in rats at high doses; 2) increases in plasma enzyme levels indicative of cellular damage in dogs and death at high doses; and; 3) liver enlargement and corneal opacity in rats that inhaled doses for only four hours.

98. By the late 1970s, the PFAS industry was aware of "compound-related effects" (effects related to PFOA) in both Rhesus monkeys and Charles River CD rats, with more severe effects observed in the monkeys, including increased incidences of kidney and liver damage.

99. By 1979, the PFAS industry was also aware of a 90-day oral study in Rhesus monkeys that had been administered dosage levels of 0, 3, 10, 30 and 100 mg/kg/day of PFOA, with the monkeys receiving the highest dose dying during weeks 2-5 of the study, three of the monkeys receiving the 30 mg/kg/day dose also died during weeks 7-12 of the study while all monkeys exposed at this dose showed signs of toxicity in the gastrointestinal tract and other adverse changes. Monkeys dosed at the two highest levels also showed weight loss from the first week of the study.

ii. <u>The 1980s: Increasing Awareness of PFAS-Related Health Risks</u>

100. Early PFOA toxicology studies were summarized in 1980, and the liver was highlighted as a target organ, while effects on the immune system were also reported. The study reports were not submitted to the EPA until the year 2000.

101. In 1980, PFA animal toxicity studies were published and were accessible to PFAS manufacturers.

102. By 1980, PFAS manufacturers had internally confirmed that PFOA is toxic and bioaccumulative and were aware that the rate of first-time myocardial infarctions (heart attacks) in company foreman at least one PFAS manufacturing facility was almost double what would have been expected.

103. Materials from a C-8 Communications meeting dated July 31, 1980, stated: "After 25 years of handling C-8, we see no damage among workers. However, the potential is there – C-8 has accumulated in the blood. Because of this accumulation we have decided to undertake programs to minimize accumulation of C-8 in the blood in the workers."

104. By 1981, the PFAS industry was aware that PFOA in the blood serum of a pregnant woman could cross the placenta to the fetus. PFOA was found to be present in the umbilical cord blood of an infant born to an employee and in the blood of an infant born to another employee.

105. By 1981, the PFAS industry was also aware that PFOA ingestion caused birth defects in rats and had found birth defects in two of seven children born to PFOA exposed workers in at least one PFAS manufacturing facility, both of whom had eye defects.

106. An experimental study conducted in 1981 showed birth defects in the eye lens of rats exposed to PFOA. A total of three teratology studies were carried out, all of them finding lens abnormalities in exposed animals, which upon information and belief, prompted PFAS manufacturers to remove all female employees from PFOA-exposed jobs without informing them of the reason for their transfer.

107. By the early 1980s, PFAS manufacturers were sharing their internal studies concerning health and environmental effects associated with exposure to PFOA with other manufacturers within the industry but concealed this knowledge from the public at large.

108. By 1984, the PFAS industry was aware that PFOA in its particulate form was being emitted in high volumes from stacks at facilities that used PFAS in their manufacturing processes and deposited in soil throughout the surrounding communities.

109. Upon information and belief, Dr. Jack Hegenbarth ("Hegenbarth") was an employee and later executive within the PFAS industry during the years of 1965 to 1989, with not only awareness, but high-level knowledge of the research related to the concerns surrounding the toxic health effects of PFOA.

110. On or around May 21, 1984, Hegenbarth and others met to review and discuss engineering studies and other evidence showing:

a. Aerial PFOA emission amounts from a PFAS manufacturing facility;

b. Aqueous emission amounts from a PFAS manufacturing facility;

c. Residual PFOA emission amounts from products manufactured at a PFAS manufacturing facility;

d. *Inter alia,* birth defects in unborn animals to PFOA;

e. Expected PFOA amounts in the blood of employees working at the PFAS manufacturing facility;

f. Estimated half-life of PFOA in human blood;

g. Methods by which a PFAS manufacturing facility might reduce employee exposure to PFOA;

h. Proposed PFOA exposure limits.

111. Notably, upon information and belief, such meeting and associated discoveries resulted in the transfer and/or termination of certain pregnant employees who had been exposed to PFOA.

112. A memo summarizing this meeting provides, *inter alia*:

a. "The review was held with Besperka, Bennett, Riddick, Gleason, Hegenbarth, Serenbetz, Raines, Kennedy, Von Schriltz, and Ingall in attendance";

b. "There was agreement that a departmental position needed to be developed concerning the continuation of work directed at elimination of [PFOA]4 exposures off plant as well as to our customers and the communities in which they operate";

c. "There was consensus reached that the issue which will decide future action is one of corporate image, and corporate liability. Liability was further defined as the incremental liability from this point on if we do nothing as we are already liable for the past 32 years of operation";

d. "Currently, none of the options developed are, from a fine powder business standpoint, economically attractive and would essentially put the long- term viability of this business segment on the line";

e. "Looking ahead, legal and medical will most likely take a position of total elimination";

f. "The product group will take a position that the business cannot afford it";

g. "The end result, in my opinion, will be that we eliminate all [PFOA] emission at our manufacturing sites in a way yet to be developed which does not economically penalize the business, and addresses the [PFOA] emission and exposures of our dispersion customers";

h. "Some information which we just developed 5/21/84 is that detectible levels of [PFOA] are in both the Lubeck, W.V. and the Little Hocking, Ohio water systems";

i. "With the development of our current fine powder expansion plan, which takes capacity up to 8.2 MMAP, through a combination of equipment and recipe changes, [PFOA] air emissions will rise from the current 12,000 lbs. / yr. to 25,200 lbs. / yr. The increase for the combined divisions will increase from a current 16,000 to 25,200 lbs. / yr. or a net 9,200 lbs. due to a 4,000 lb. offset with the implementation of the TBSA program. This will increase further with the installation of the third dryer (12 MMAP fine powder) to about 37,000 lbs. / yr.";

j. "[PFOA] will now become a major issue on all further project work in the fine powder area, starting with the Wilmington Scope Review 6/29/84. In preparation for that review, I have requested the ESO ground level concentration study be redone using the new production volumes and recipe (45% solids). Also, we have included in the draft scope of work a new small exhaust system in the front end of the dryer bed to try to catch most of the [PFOA] in a much lower volume air stream. The project will put this stream to

---

[4] Throughout the summary, PFOA is referred to as "C-8."

the exhaust stack. The intent is to first reduce in plant exposure, and second leave a future capability for treatment of this relatively concentrated stream."

k. "I believe we need to sit back down with the new information we now have, and the feedback we have gotten from these meetings and jointly with Putnam review our plant position. Raines at one point had rejected reduction as an option. This needs to be included in our thinking again."

113. By no later than June 14, 1984, the PFAS industry was aware that the average biological half-life of PFOA in human blood was approximately 2.4 years, but with considerable variability between individuals, and that male operators in at least one PFAS manufacturing facility complained about difficulty in achieving pregnancy with their wives.

114. By 1986, a cancer morbidity study among employees exposed to PFAS showed male hourly wage workers had an incidence of bladder cancer deaths at more than double what would have been expected.

115. By 1987, a study conducted of at least one plant where fluorochemicals were used found increases above expected rates of death from female breast cancer, bladder cancer, Hodgkin's lymphoma, lung cancer, urinary cancers in men, and cirrhosis of the liver in women.

116. By 1988 at the latest, the PFAS industry was aware that PFOA was associated with increased rates of carcinogenicity in rats, including testicular cancer.

117. In 1989, a study of cancer incidence among employees at a PFAS manufacturing facility detected an increased incidence of leukemia, buccal cavity and pharynx cancer, kidney and other urinary cancers, including bladder cancer and multiple myeloma.

118. By 1989, the PFAS industry was aware that there were increases in other cancers in employees at PFAS manufacturing facilities as well, including pancreatic, lung, kidney, and bladder cancers and Hodgkin's lymphoma.

iii. The 1990s: Gore Hires Dr. Jack Hegenbarth to Oversee PTFE Production

119. Upon information and belief, on or about 1990, Hegenbarth was hired by Gore to head a broad range of Gore research, development, and manufacturing activities, and in particular the management of many Gore issues involving C8.

120. With Hegenbarth's hire, beyond continuing to operate as a purchaser and processor of products containing APFO/PFOA, Hegenbarth spearheaded efforts enabling Gore to polymerize PTFE using APFO.

121. Upon information and belief, due to his intimate familiarity with the toxic and otherwise harmful nature of PFOA gained while working as an employee and executive within the PFAS industry, Hegenbarth was ideally suited to manage imminent PFOA-related issues in Gore's new production projects.

122. Hegenbarth assembled his team at Gore Cherry Hill with former colleagues and fellow leaders in the PFAS industry, including Patty McGuigan ("McGuigan"), a world-renowned expert in surfactants and surface chemistry. McGuigan worked with Hegenbarth directly during Hegenbarth's early years at Cherry Hill through 1994.

123. In or about March 1996, Richard Baillie ("Baillie"), who previously worked with Hegenbarth in an executive role at a different PFAS manufacturing facility where he was present during multiple executive meetings and gained actual knowledge of the toxic nature of PFOA, joined Hegenbarth's team at Gore Cherry Hill.

124. Prior to joining Gore, Richard Baillie was copied on a September 28, 1994 memorandum regarding "C8 Ammonium Perfluorooctanoate Fluorosurfactant Strategies and Plans." He was instructed to return the draft copy for destruction after he read it. He was instructed to work with suppliers and others, and "use outside resources to leverage efforts." He was also

instructed to "Initiate C-8 recycle and recovery from U.S. Gore". Attached to the memorandum was a copy of Roger Zipfel's September 15, 1994 report ("The Zipfel Report").

125. The Zipfel Report, Appendix E, documented liver changes and testicular cancer in rats exposed to inhalation of C8. Appendix E states "[t]the concern around the long them effects of ammonium perfluorooctane is related to its persistence in human blood". Appendix E also notes a possible increase in prostate cancers related to APFO.

126. Upon information and belief, due to Baillie's intimate familiarity with the toxic and otherwise harmful nature of PFOA, he was seen to be ideally suited to manage imminent PFOA-related issues and served a "key role" at Gore.

127. By 1990, the PFAS industry was aware that there was a statistically significant excess of deaths among workers exposed to PFAS due to urinary cancers, a statistically significant increased incidence of bladder cancer in male employees, a statistically significant increase in mortality from cancer of the digestive organs among female employees, and female employees continued to have a statistically significant elevation in the incidence of cirrhosis of the liver. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

128. A 1990 internal industrial hygiene data review demonstrated a correlation between PFOA levels in the air and PFOA blood levels in workers who inhaled contaminated air. It was found that levels in blood were an order of magnitude higher than the levels in the air, which demonstrated that PFOA bioaccumulated inside the human body. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

129. In a report dated April 12, 1990, entitled "Investigation of Hormonal Mechanisms for C-8 Induced Leydig Cell Adenoma," which reviewed data derived from an animal study, the authors concluded that the induction of Leydig cell adenoma (testicular tumors) related to PFOA

exposure was likely to be hormonally mediated. Upon information and belief, such findings were known to Hegenbarth and Gore.

130. By October of 1990, the PFAS industry was aware that PFOA induced a dose-related decrease in serum testosterone, which appeared to document a direct effect of PFOA on the testes. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

131. A memo authored by PFAS industry employees dated March 15, 1991, reported on a meeting at which employees decided that "[a] warning of potential C-8 hazards (especially from condensate) should be included in material safety data sheet (MSDS) for all products in which C-8 concentration is 0.1% or more." The memo also indicates that all other "product literature which contains safety or health warnings should be revised to be consistent with MSDS." Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

132. In the unpublished 1992 thesis of Frank Gilliland, MD, who studied the clinical pathology parameters of 111 male workers at a PFAS manufacturing facility in Cottage Grove, MN, Dr. Gilliland found a positive correlation between PFOA exposure measured as serum total organic fluorine and estradiol (an adverse effect) and a negative correlation with free testosterone (also an adverse effect) with this association being stronger in older men. Dr. Gilliland concluded that PFOA may affect male reproductive hormones. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

133. Dr. Gilliland's 1992 unpublished thesis from his worker study also showed thyroid effects in production workers that were associated with organofluorine concentrations in worker blood serum. A positive correlation was seen between organic fluorine and the thyroid stimulating

hormone in serum, a sign of thyroid deficiency. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

134. PFAS manufactures learned that doses of PFOA as low as 300 ppm caused statistically significant increases in adenomas and carcinoma of the liver and pancreas, and Leydig cell adenomas in the testes. By 1993, the PFAS industry was aware of two animal studies that found that PFOA caused testicular cancer and cancer at three different anatomical sites among laboratory animals exposed to PFOA. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

135. By 1993, the PFAS industry also knew that a mortality study of PFAS production workers showed a 3-fold excess occurrence of prostate cancer in workers employed more than ten years. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

136. In 1995, the UK company, Imperial Chemical Industries, strongly espoused that APFO should be considered an animal carcinogen, as the benign tumors observed are simply early lesions that ultimately lead to malignant tumors. However, other PFAS industry representatives disagreed. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

137. By 1996, the PFAS industry was aware that certain testing linked PFOA to DNA damage. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

138. In or about 1996, certain PFAS manufacturers jointly commissioned studies to assess the effects of PFOA on humans by exposing monkeys to the chemical. By November of 1998, the monkeys in this study were suffering from severe health effects. By 1999, even the monkeys receiving the lowest dose of PFOA were suffering adverse health effects, including liver toxicity, and it was determined that no observable effect level (NOEL) could not be found in non-

human primates. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

139. As of January of 1997, the PFAS industry was aware of a hormonally mediated mechanism for the Leydig cell tumors in rat testes. In a document entitled "Hazard Characterization for Human Health in C8 Exposures, CAS Registry No. 3825-26-1," Lisa B. Biegel, Ph.D., Senior Research toxicologist at the DuPont Haskell Laboratory, wrote: "[t]he studies summarized below support a hormonally-mediated mechanism for the Leydig cell tumorigenesis: C8 produces an increase in hepatic aromatase activity, which elevates serum estradiol concentrations, which in turn modulates growth factors in the testes, which results in tumor formation. The mechanism of tumorigenesis is not completely understood, and therefore relevance to humans cannot be completely ruled out. However, it is known that non-genotoxic compounds (such as C8) produce Leydig cell tumors by altering the endocrine system." Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

140. A paper published in 1997 by John C. Cook and Eric D. Clegg, concluded: "[o]ccurrence of Leydig cell adenomas in test species is of potential concern as both a carcinogenic and reproductive effect if this mode of induction and potential exposure cannot be ruled out as relevant for humans [and]…it should be assumed that humans are potentially susceptible." Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

141. Upon information and belief, in the late-1990s, PFOA in its particulate form was being emitted in high volumes, with no, or with insufficient mechanisms and destruction capacities to effectively remove the large quantities of APFO from the three subject Gore Facilities: Cherry Hill, Fair Hill, and the Appleton complex. The emissions were deposited in soil and water sources

throughout the surrounding communities. Around this time, PFAS industry leaders communicated about ways to remove APFO from emissions.

142. In 1999, calculations by a PFAS industry employee showed that a "general population member with [PFOA levels of] 70 ppb (in one's blood) could have 36 times more in his liver" due to life-time accumulation. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

iv. The 2000s and Beyond: The Barr Report and Gore's Disinformation Campaign

143. On or about February 23, 1999, an Employee at Gore, who lived directly across from the Gore Cherry Hill Facility at 2416 Singerly Road, Elkton MD 21921-000, died of cancer-related complications.

144. Upon information and belief, PFOA emissions from the Cherry Hill Facility contaminated the well on this employee's property, which was located near Cherry Hill.

145. In or about July 19, 2000, Gore, with knowledge of PFOA contamination at the site, purchased the home of this former employee, and subsequently razed the property to the ground.

146. In April of 2000, a PFAS manufacturer rejected its own occupational health official's recommendation for a comprehensive medical surveillance program for employees exposed to PFOA, noting that establishing such a program "could have significant repercussions at any of our other sites that handle…similar products." Upon information and belief, such information was known to Hegenbarth, Baillie and Gore.

147. In or about 2000, the EPA notified a PFAS manufacturer that it intended to pursue more rigorous regulation of the perfluorinated chemicals it manufactured. Shortly thereafter, that PFAS manufacturer publicly announced that it was voluntarily withdrawing from the perfluorinated chemical market, including its manufacturing of PFOA. Two of the reasons cited

for the manufacturer's decision were PFOA's (1) bio-persistence and (2) toxicity. Upon information and belief, such information was known to Hegenbarth, Baillie and Gore.

148. In October of 2001, Paul M. Hinderliter, Ph.D. and Gary W. Jepson, Ph.D. of the DuPont Haskell Laboratory, drafted a paper entitled "A Simple, Conservative Compartmental Model to Relate Ammonium Perfluorooctanoate (APFO) Exposure to Estimates of Perfluorooctanoate (PFO-) Blood Levels in Humans." The paper described calculations which showed that ingestion of 1 ppb of PFOA in drinking water corresponded to human PFOA blood levels 300 times higher. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

149. In March of 2002, a PFAS manufacturer's website, titled "C-8 INFORM" continued to state that PFOA had no adverse health effects and misrepresent the decades of studies and scientific data related to health effects associated with C8 exposure.

150. By 2003, the PFAS industry was aware of at least one mortality study and a mortality registry of workers exposed to PFAS, which reported excess bladder cancer incidence with high exposure jobs and an excess of kidney cancer deaths over expected levels, respectively. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

151. Around this time, Gore began its "APFO Project" which included gathering data from all of Gore's subject facilities: Cherry Hill, Fair Hill, and the Appleton complex.

152. Baillie and Walton were both members of an organization called the Fluoropolymers Manufacturers Group ("FMG") of the Society of the Plastics Industry, Inc., ("SPI"), with Baillie serving as the group's Chairman in 2003.

153. Membership criteria required each member either be (1) a processor of APFO containing dispersion resins or (2) a compounder of APFO-containing dispersions and resins.

154. On March 14, 2003, FMG, wrote to the EPA providing information about uses of fluoropolymers made with perfluorooctanoic surfactants. The EPA was concerned about the data provided to the EPA on PFOA, and the fact that PFOA was detected in the human blood in the general population.

155. On October 31, 2003, the group changed its name to Fluoropolymers Processors Group ("FPG").

156. An email of the October 31, 2003 meeting minutes from FPG discussed the FPG Mass Balance Program, in which participating companies would participate in a written survey about processes associated with dispersion and Barr would subsequently perform a sample collection at the responding facility. Upon information and belief, Gore was aware of this meeting and its contents.

157. In January of 2005, a final draft, titled "Dispersion Processor Material Balance Project", prepared by Barr Engineering Company, KHA Consulting LLLC, Keller and Heckman LLP, was circulated ("Barr Report"). Upon information and belief, this report was finalized in February of 2005. Upon information and belief, prior drafts of this report were circulated and distributed to FPG, and reviewed by Gore executives, including, but not limited to Baillie and Lisa Walton, prior to the January 2005 final draft, and a draft existed with findings in December 2004.

158. The Barr Report itself said "The number who agreed to participate was such that all could be accepted into the Study."

159. On December 21, 2004, Gore purchased multiple parcels of land surrounding the Cherry Hill Facility, including two parcels on Leeds Rd, Elkton MD 21921-000, and 10.07 acres of land on Singerly Rd., Elkton MD 21921-0000. Upon information and belief, this was in response

to Gore's knowledge that the Barr Report would publish information related to the environmental contamination caused by APFO emissions.

160. The Barr Report states, "[t]he FMG decided to study this group of processors because AFD were known to contain small amounts of PFOA salt known as ammonium perfluorooctanoate (APFO)." The Barr Report found that based on the results of sampling an analysis 62% of the APFO from AFD is destroyed and approximately 25% ends up in the air, water, and solid waste streams.

161. Shortly after the final Barr Report was published, on March 8, 2005, Gore purchased additional property near the Gore Cherry Hill Facility, including, but not limited Milburn Farm Orchards. The Milburn Farm Orchards was subsequently razed to the ground.

162. In 2006, the EPA reached a settlement agreement with a PFAS manufacturer to resolve the manufacturer's alleged reporting violations under the Toxic Substances Control Act regarding its fluorochemicals. The agreement did not require the manufacturer to admit to the violations, but the company agreed to pay a penalty in excess of $1.5 Million for 244 separate alleged violations. Upon information and belief, such information was known to Hegenbarth, Baillie, and Gore.

163. In 2009, a follow-up study of workers exposed to PFOA showed an increase in prostate cancer incidences in workers with moderate to high exposures. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

164. Toxicology studies show that PFOA is readily absorbed after ingestion or inhalation exposure. PFOA has an elimination half-life in the human body of 2 to 9 years. PFOA binds to albumen in the blood serum and is concentrated in the liver and kidneys. Indeed, PFOA is especially concerning from a human health standpoint precisely because it can stay in the

environment and in the human body for long periods of time. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

165. PFOA is associated in medical literature with increased risk in humans of various forms of cancer including kidney, testicular, liver, thyroid and others, as well as thyroid disease, ulcerative colitis, high cholesterol, high uric acid levels, elevated liver enzymes, and pregnancy-induced hypertension, as well as other conditions. Studies of PFOA exposure in animals have shown the ability to cause other cancers not yet associated with human exposure. The EPA has also advised that exposure to PFOA may result in developmental effects to fetuses during pregnancy or to breastfed infants, liver damage, and various immunological effects. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

166. In May 2006, the EPA Science Advisory Board stated that PFOA cancer data are consistent with guidelines suggesting exposure to the chemical is "likely to be carcinogenic to humans." These health conditions can arise months or years after exposure to PFOA. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

167. On February 2, 2022, Gore, with full knowledge of all of the above, wrote a letter opposing legislative efforts to place restrictions on PFAS substances in the State of Maryland through its lobbyist. In its letter, Gore argued that "the definition of PFAS (per- and poly-fluoroalkyl substances) is overly broad and includes high molecular weight fluoropolymer such as PTFE, which are highly stable, too large to be bioavailable, and do not have potential to become widespread in the environment".

168. As identified by U.S. District Judge Richard Gergel in MDL No. 2:18-mn-2873, these continued and persistent efforts by Gore and other PFAS industry leaders to delay public dissemination of known toxicity delayed scientific discovery and research to the detriment of

public health outcomes. *In re Aqueous Film-Forming Foams Products Liability Litigation*, 2022 WL 4291357, MDL No. 2873 (D.S.C. Sept. 16, 2022) (Gergel, J.) ("few studies were published on polyfluoroalkyl substances before 2000 but since then a flood of studies have been released in the general scientific community, some years exceeding 1,000.").

**D. <u>Gore's Knowledge of PFOA Environmental Contamination</u>**

169. By the early 1960s, the PFAS industry understood that groundwater near waste disposal sites would be contaminated with PFAS. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

170. By 1966, the PFAS industry was aware that PFAS, including PFOA, move rapidly in groundwater and migrate into nearby bodies of water. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

171. By the mid-1970s to early 1980s, the PFAS industry was also aware of certain groundwater and surface water sources located near PFAS manufacturing facilities that were contaminated with PFAS. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

172. By 1984, the PFAS industry was aware that PFOA in particulate form exhausted from stacks at PFAS manufacturing facilities would be carried by the wind well beyond the plant property line and deposited in the soil throughout the community. The PFAS industry also learned that drinking water supplies in communities around manufacturing plants processing and utilizing PTFE products containing APFO were contaminated with PFOA (1) from air emissions of APFO from the plant and subsequently, deposited on ground, dissolved in rainwater and then percolated into the groundwater and (2) from direct discharges of liquids containing PFOA into the Ohio River. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

173. By 1984, the PFAS industry was aware that PFOA was present in the public drinking water supply in areas located near PFAS manufacturing facilities. Samples of tap water reported to be from public drinking water supplies near those facilities found that PFOA was present in drinking water samples collected. Upon information and belief, this decision was shared with Hegenbarth, Baillie, and Gore.

174. Despite this knowledge, the PFAS industry, including Gore, chose not to alert the public or Plaintiffs.

175. By June of 1984, the PFAS industry was aware that water supplied by a town located downriver from a PFAS manufacturing plant, contained PFOA levels of at least 500 ppt. Because of the location of the contaminated wells in in relation to the facility and the direction of flow of the river, manufacturer knew that this contamination was caused by PFOA released into the air from its manufacturing facility. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

176. By 1985, the PFAS industry was aware that PFOA was leaching into groundwater beneath digestion ponds that had previously been used to dispose of PFOA-contaminated sludge and was migrating through the groundwater under the plant into the public drinking water supply where PFOA levels were detected as high as 1,500 ppt. These PFOA levels increased to 1,900 ppt in 1987 and 2,200 ppt in 1988. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

177. By 1987, air modeling documented PFOA in the ambient air beyond the fence line of a PFAS manufacturing facility that resulted from emissions drifting with the wind into nearby communities. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

178. Upon information and belief, PFAS manufacturers and Gore shared information about the environmental contamination potential of PFAS such as PFOA and PFOS from as far back as the 1980s and the information alleged to be known by one was made known to the other.

179. In 1995, the American Conference of Governmental Industrial Hygienists ("ACGIH") adopted a threshold limit value ("TLV") for APFO; Defendant requested and was in receipt of this regulation in June of 1995.

180. Upon information and belief, Gore understood this TLV to apply to its Maryland facilities through the State's Air Toxics regulatory scheme.

181. As a part of this scheme, TLV were adapted by a coefficient of 1/100, when assessing ambient air in the fence line community.

182. Aware of this regulatory framework, Defendant requested a variance from MDE in March of 2000.

183. Beginning with ACGIH's adoption of a TLV for PFOA in 1995, under Maryland's Air Toxics Laws, Gore was required, as part of its subsequent permit applications, to: (a) quantify the emissions of toxic air pollutants ("TAPs") from the facility under COMAR 26.11.15.04; (b) apply the best available control technology for toxics ("T-BACT") under COMAR 26.11.15.05; and (c) demonstrate, for each TAP, that the premises-wide emissions will not adversely affect human health through meeting set screening level benchmarks under COMAR 26.11.15.06.

184. Upon information and belief, despite an acute awareness of these requirements and intimate knowledge of the regulatory scheme, Gore failed to disclose this information for at least eight years following the adoption of the 1995 TLV.

185. In fact, on September 1, 2003, Gore submitted a comprehensive permit application to MDE without mentioning (a) any quantification of APFO/PFOA; (b) any technology to control

APFO/PFOA; or (c) any demonstration that APFO/PFOA would not adversely impact human health; in the 42 pages of Gore's application for a permit under the State's Air Toxics program, not one mention was made of "APFO" or "PFOA," and the permit was only described as being for a "PTFE Manufacturing Facility."

186. The same misrepresentations to regulators occurred with regard to the Appleton complex. Gore wrote MDE in March of 2003 that, "[b]ecause [the Appleton South] site does not have emissions from Toxic Air Pollutants, I will not be including [TAP forms], as they are not applicable." Meanwhile, upon information and belief, Gore was aware of and tracking APFO/PFOA emissions from the Appleton South facility.

## E. A History of PFOA Regulatory Limits

187. In 2009, the EPA identified PFOA and PFOS, among other PFAS, as an emerging contaminant of concern and issued provisional health advisories (”HAs”) under the Safe Drinking Water Act stating that exposure to concentrations of PFOA at 400 ppt or more or PFOS of 200 ppt or more in drinking water can cause adverse human health effects.

188. EPA updated its health advisories for PFOA and PFOS, including setting a lifetime health advisory of 70 ppt for both substances in 2016. In 2022, in accordance with the rapidly-evolving understanding of the danger presented by these substances, EPA set interim lifetime health advisories of 0.004 ppt for PFOA and 0.02 ppt for PFOS that took into account drinking water, air, food and products. These advisories were intended to provide guidance.

189. The body of science establishing the danger of PFAS continued to expand and, in April 2021, EPA created an EPA Council on PFAS to establish a strategy for accelerated regulation of PFAS, among other things.

190. In May 2021, the Agency for Toxic Substances and Disease Registry finalized toxicological profiles for PFOA and PFOS (among other PFAS) that established minimal risk

levels based on the danger presented by PFAS. From these, EPA established a human Reference Dose (RfD) of 0.000002 mg/kg/day. The Reference Dose is defined by the EPA as an "estimate (with uncertainties spanning perhaps an order of magnitude) of the daily exposure to the human population (including sensitive subgroups) that is likely to be without an appreciable risk of deleterious effects during a lifetime."[5]

191. In February 2024, EPA proposed to list 9 PFAS (including PFOA and PFOS) as "hazardous constituents," under the Resource Conservation and Recovery Act (RCRA"). The effect of including these substances in the RCRA hazardous constituent list appearing at 40 CFR § 261, Apdx VIII is to bring PFAS contaminated sites within RCRA's corrective action authority, available to EPA and to citizens.

192. In April 2024 EPA established a National Primary Drinking Water Standard for PFAS, including PFOA and PFOS. Unlike the prior Health Advisories, Safe Drinking Water standards must also take into consideration cost of implementation and practical enforceability. EPA set the standards for PFOA and PFOS at 4 ppt. Certain other PFAS were set at 10 ppt. These standards became the operative Maximum Contaminant Levels ("MCLs") for drinking water. The MCLs guide cleanups of groundwater at contaminated sites.

193. In April 2024, the EPA designated PFOA and PFOS as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). This has the effect of making sites contaminated with these substances subject to clean up under the Superfund law. It also requires that releases of these harmful chemicals be reported.

194. In September 2024, EPA established PFOS and PFOA freshwater ambient water quality criteria and saltwater benchmarks for fish, which have also been contaminated by PFAS

[5] United States EPA, Health Effects Support Document for Perfluorooctanoic Acid (PFOA), p. 4-1 (May 2016).

discharges. EPA also established ambient water quality benchmarks for the broader array of PFAS substances that are harmful to fish.

195. Maryland, having detected PFAS in fish tissue from the Chesapeake Bay, has also set a fish consumption advisory.

196. The website for Maryland's Department of the Environment ("MDE") describes PFAS, including PFOA, as chemicals that "are persistent in the environment and the human body, meaning they do not break down easily and accumulate over time."

197. MDE has published on its website that, "According to the Agency for Toxic and Disease Registry (ATSDR) some, but not all, studies in humans with PFAS exposure have shown that certain PFAS may: affect growth, learning and behavior of infants and older children, lower a woman's chance of getting pregnant, interfere with the body's nature hormones, increase cholesterol levels, affect the immune system, [and] increase the risk of cancer."

**F. Gore's PTFE Processing in Maryland**

198. At times relevant to the facts alleged herein, Gore was the largest producer of fluoropolymer fabricated products in the United States and its main plants were those in Maryland and Delaware; in 2003, Gore reported a total of 32 industrial drying ovens at Cherry Hill alone.

199. Upon information and belief, during the relevant time-period, Gore was engaged in the manufacture of various commercial, electronic, medical and industrial products, including fabrics, gaskets, flame-retardant materials, fibers, filters, coated wires, bags, pipes, among other products.

200. Production of these products predominantly involved the processing of APFO containing fluoropolymers, including PTFE and FEP, either in fine powder or aqueous forms, which Gore would obtain from a variety of chemical manufacturers.

201. Gore's processing operations took place at numerous sites, including several sites within the Elkton region, including Cherry Hill, Fair Hill, and the Appleton complex.

202. Upon information and belief, in many cases, the production of a Gore product involved processing at multiple facilities.

203. For example, PTFE, purchased either in fine powder or aqueous dispersion forms, was commonly shipped from manufacturers to Gore's Cherry Hill Facility.

204. There, PTFE would be processed into "intermediaries," i.e. PTFE processed into membranes or other forms, which would then be shipped to other regional facilities for further processing into salable commercial goods.

205. In addition to manufacturing "intermediate" forms of PTFE, corporate product development work was commonly carried out at Gore's Cherry Hill plant, and then processes would be moved from that location to plants in the surrounding area to satisfy product demand for newly developed materials.

206. Upon information and belief, substantial volumes of raw PTFE, including aqueous dispersion, were also processed at Gore's Fair Hill facility. Among other types of PTFE processing, Fair Hill's production included coating of "intermediaries" with APFO containing fluoropolymers, for the production of various industrial saleable goods.

207. Gore's Appleton facilities similarly processed substantial volumes of PTFE, including aqueous dispersion, and employed techniques to coat products with materials containing PTFE, among other processing of APFO containing fluoropolymers. Upon information and belief, these products created at the Appleton complex included industrial sealants, GFO packing fibers, Silcore (or "Silkore"), PTFE Tubing (K-Core), and part-PTFE tapes.

208. At each Gore facility involved in the processing of PTFE, including Cherry Hill, Fair Hill, and the Appleton complex, Gore's production methods, which included drying, heating, or sintering of APFO containing fluoropolymers, resulted in the volatilization and emission of APFO into the environment. Additionally, Gore's production methods for these products resulted in discharges of APFO in wastewater.

i. <u>Gore's PTFE Processing at the Cherry Hill Facility</u>

209. Gore's Cherry Hill facility opened in 1973.

210. At that time, because Gore-Tex technology was in constant state of development, Cherry Hill employees were exclusively devoted to the research, development, manufacture, and marketing of Gore-Tex expanded PTFE technologies.

211. Upon information and belief, though Cherry Hill quickly grew and solidified distinct product lines related to ePTFE and PTFE processing, it still maintains a research and development focus to this day.

212. The first product created with Gore-Tex technology was the thread seal tape.

213. By 1977, a mere four years since the plant opened, Cherry Hill sold several million rolls of thread seal tape on an annual basis through large volume distributors.

214. As it continued to grow, Cherry Hill created numerous industrial products, including but not limited to: the thread seal tape, valve stem packing, joint sealant, electrical wire insulation, lamination membrane products such as rainwear, filter media, filter bags, and various gasket devices.

215. All of these products utilized some form of Gore-Tex/ePTFE/PTFE technology.

216. Fundamental to the processing and production of these products was the conversion of PTFE powder, as received by suppliers such as DuPont and ICI, to usable forms such as tapes, cords, and tubes.

217. In fact, processing was centralized at Gore's Newark, Delaware plant until 1975, when PFTE processing was moved to Cherry Hill.

218. In only 30 years, from 1973 to 2003, Cherry Hill expanded from eight (8) employees in 1973, to one-hundred (100) in 1975, to more than three-hundred (300) by 2003.

219. Upon information and belief, Cherry Hill's substantial growth was essential to Gore becoming one of the largest producers of PTFE products in the United States.

220. Upon information and belief, all of these products required Gore's ePTFE technology, which was implemented at the Cherry Hill facility.

221. At all times relevant to the allegations herein, the processing of ePTFE commonly required the use of APFO/PFOA as a surfactant.

222. When APFO and PFOA were used, contaminated processed water was a residual, which, upon information and belief, was disposed of through various means.

223. There were two retention ponds located at the Gore Cherry Hill Facility and because the ever-growing PTFE-processing lines generated consistently large amounts of PTFE-laden APFO contaminated processed water, Gore was disposing of into either (1) a wastewater treatment system; or (2) these onsite retention ponds.

224. Moreover, the processing of PTFE and ePTFE into products for sale required the use of large industrial drying ovens and interconnected oxidizer systems.

225. As mentioned above, Cherry Hill alone had 32 industrial drying ovens in 2003. These ovens, upon information and belief, emitted large amounts of APFO/PFOA contamination into the atmosphere.

226. These persistent APFO/PFOA vapors, released through the drying process, then after entering the atmosphere, upon information and belief, contaminated the groundwater of homes in the community through precipitation (wet deposition) and/or settling (dry deposition).

227. Both the disposal of PTFE-laden, APFO/PFOA contaminated processed water into the public sewage system, and the gaseous emissions of PFOA caused the community surrounding Cherry Hill to have unsafe levels of PFOA in their home's groundwater.

ii. Gore's PTFE Processing at the Fair Hill Facility

228. Upon information and belief, Gore's Fair Hill facility also processed large quantities of PTFE during the creation and/or coating of various products, such as filter bags, electronic wires and cables, felts, laminates, and other products.

229. Well water data shows levels of PFOA in the groundwater of the surrounding residential community in exceedance of EPA's applicable MCLs.

230. Upon information and belief, the Fair Hill facility received PTFE intermediates from Gore Cherry Hill and also utilized APFO-containing aqueous dispersion for coating applications.

231. In order to create filter bags, Gore's Fair Hill facility employed a coating process that required the use of extreme heat, generated from ovens.

232. Upon information and belief, this process also required the use of water, which was contaminated with PTFE as a result, and disposed of after use.

233. At the end of this process, upon information and belief, Gore produced: (i) processed water contaminated with PTFE; (ii) gaseous emissions contaminated with PTFE; and (iii) either PTFE pellets ready to be shaped into salable commercial goods or finished goods themselves.

234. Upon information and belief, Gore had uniform hazardous waste disposal protocols across its Maryland facilities.

235. This protocol classified hazardous waste as that which was either (i) ignitable, (ii) corrosive, (iii) reactive, or (iv) toxic.

236. At times relevant to the allegations in this complaint, Gore did not classify PTFE as toxic.

237. PTFE-laden processed water, contaminated with APFO/PFOA, is inert, and not corrosive, ignitable, or reactive.

238. Furthermore, PTFE-laden processed water could not be considered "regular trash" under the terms of the protocol, as it was a free-flowing liquid.

239. Therefore, upon information and belief, this processed water, which was contaminated with PTFE, was not being treated as "hazardous" or as "regular trash" under Gore's protocols.

240. Because it was not treated as either hazardous or regular trash, Gore's Fair Hill facility was releasing this PTFE-laden processed water, contaminated with APFO/PFOA, into the surrounding community's water table through either its own on-site retention pond, or the local sewage treatment plant.

241. Upon information and belief, in 2022 Gore was aware that when PTFE-laden water was being created as a residual of Gore's processes it was either being drummed or sent to the onsite water treatment facility, and eventually to the Publicly Operated Treatment Works.

242. In addition to this PFOA-contaminated processed water, contaminated gaseous emissions were being released into the air during the Fair Hill's oven drying process.

243. At the end stages of Gore's process at Fair Hill, the PTFE pellets were dried in large industrial ovens to be made useable for commercial purposes or, alternatively, the ovens served as the final step in preparing finished goods for sale.

244. This drying process released gaseous emissions, that were contaminated with PFOA, into the surrounding community's air and atmosphere.

245. As early as 1991, Fair Hill was emitting 13 tons per year of regulated airborne pollutants, as defined under MDE regulations.

246. Upon information and belief, a significant portion of these emissions were from the ovens' drying of PFTE pellets or other PTFE-laden materials and, at Fair Hill alone, this accounted for approximately 4,000 pounds of PTFE being used.

247. At times relevant to the allegations set forth herein, Gore had not tested whether APFO was being destroyed during the drying process, and yet continued to expand production at Fair Hill, filing for the permitting of new equipment with the Maryland Department of the Environment as well as requesting to use ovens for unpermitted purposes, including research and development projects of varying scale.

248. At all times relevant to the allegations contained herein, Gore's PTFE and ePTFE contained approximately 1 to 2% PFOA/APFO.

249. These persistent APFO/PFOA vapors, released through the drying process, then entered the atmosphere and, upon information and belief, entered the groundwater of homes in the community through precipitation (wet deposition) and/or settling (dry deposition).

250. Both the disposal of PTFE-laden, APFO/PFOA contaminated processed water into the public sewage system, and the gaseous emissions of PFOA caused the community surrounding Fair Hill to have unsafe levels of PFOA in their home's groundwater.

251. Concerned with the potential harmful effects on human health posed by PFOA/PTFE exposure, Gore began testing the blood of its employees, including those at Fair Hill; the results showed PFOA in the blood of its employees, ranging from 0.012 ppm to 1.7 ppm.

252. Due to its association with other industry leaders, Gore was aware that PFOA accumulated in environment due to its resistance to degradation.

253. In spite of the fact that Gore knew these chemicals bioaccumulated due to its resistance to environmental degradation, and Gore's concern that PFOA was harmful to human health, production at Fair Hill increased, leading to further and continued contamination of the surrounding community's well water.

iii. Gore's PTFE Processing at the Appleton Complex

254. Gore's Appleton facilities also processed large quantities of PTFE during the creation of GFO packing fibers, part-PTFE resin Chroma tape, and other industrial products.

255. Well water data shows levels of PFOA in the groundwater of the surrounding residential community in exceedance of EPA's applicable MCLs.

256. Upon information and belief, the Appleton facilities received PTFE intermediaries from Gore Cherry Hill and, in the creation of Chroma tape, employed a coating process that required the use of extreme heat, generated from large industrial ovens.

257. Additionally, the GFO process created significant amounts of sludge waste that was sent to a local landfill, as late as 2022. This landfill was suggested by Gore employees; it already contained perfluoroalkyl carboxylic acid-contaminated waste from Cherry Hill.

258. Upon information and belief, these Appleton complex processes also required the use of water for lubrication, filtration, and cooling, which was contaminated with PTFE as a result, and disposed of after use.

259. At the end of these processes, upon information and belief, Gore produced: (i) processed water contaminated with PTFE; (ii) gaseous emissions contaminated with PTFE; and (iii) PTFE material ready to be shaped into salable commercial goods.

260. Upon information and belief, Gore had uniform hazardous waste disposal protocols across its Maryland facilities.

261. This protocol classified hazardous waste as that which was either (i) ignitable, (ii) corrosive, (iii) reactive, or (iv) toxic.

262. At times relevant to the allegations in this complaint, Gore did not classify PTFE as toxic.

263. PTFE contaminated water is inert, and not corrosive, ignitable, or reactive.

264. Furthermore, PTFE contaminated water it could not be considered "regular trash" under the terms of the protocol as it was a free-flowing liquid,.

265. Therefore, upon information and belief, this processed water, which was contaminated with PTFE, was not being treated as "hazardous" or as "regular trash" under Gore's protocols.

266. Because it was not treated as either hazardous or regular trash, upon information and belief, Gore's Appleton complex facilities were releasing this PTFE-contaminated processed water into the surrounding community's water table through either its own on-site retention pond, or the local sewage treatment plant.

267. Upon information and belief, in 2022 Gore was aware that when PTFE-laden water was being created as a residual of Gore's processes it was either being drummed or sent to the onsite water treatment facility, and eventually to the Publicly Operated Treatment Works.

268. In addition to this PTFE contaminated processed water, PTFE contaminated gaseous emissions were being released into the air during Apple South's ovens drying processes.

269. At the end stages of Gore's process at the Appleton facilities, the PTFE pellets were dried in large industrial ovens to be made useable for commercial purposes.

270. In internal memoranda, Gore determined that using the ovens at capacity was emitting too much APFO.

271. This drying process released gaseous emissions, that were contaminated with PTFE, into the surrounding community's air and atmosphere.

272. Upon information and belief, by the early 1990s, a significant portion of the Appleton complex's total emissions were from the ovens' drying of PFTE pellets or other PTFE-laden materials.

273. In fact, Appleton South alone used tens of thousands of pounds of PTFE per year.

274. In the mid-to-late 1990s, Gore had not tested whether APFO was being destroyed during the drying process, and yet continued to expand production at Appleton South, with new permitting of equipment, such as multiple new oxidizers, with the Maryland Department of the Environment.

275. Furthermore, in 2003, Gore sought expansion of its Silcore processing at Appleton South with the addition of a second Silcore line, as shown through permitting with MDE.

276. At this time, Gore was aware that APFO was being lost during the drying and potentially the sintering processes at Appleton South.

277. These persistent APFO/PFOA vapors, released through the drying process, then entered the atmosphere and, upon information and belief, entered the groundwater of homes in the community through precipitation (wet deposition) and/or settling (dry deposition).

278. Both the disposal of PTFE contaminated processed water into the public sewage system, and the gaseous emissions of PTFE caused the community surrounding the Appleton complex to have unsafe levels of PFOA in their home's groundwater.

279. Concerned with the potential harmful effects on human health posed by PFOA exposure, Gore began testing the blood of its employees, including those at the Appleton complex; the results showed PFOA in the blood of its employees, ranging from 0.012 ppm to 1.7 ppm.

280. Gore did not offer blood testing of non-employees; upon information and belief, community members not employed by Gore were not alerted or assisted with blood testing.

281. During this time, due to its association with other industry leaders, Gore was aware that APFO accumulated in the environment due to its resistance to degradation.

282. In spite of the fact that Gore knew PFOA bioaccumulated due to its resistance to environmental degradation, and Gore's concern that PFOA was harmful to human health, production at the Appleton complex increased, leading to further and continued contamination of the surrounding community's groundwater.

## CAUSES OF ACTION

### COUNT I
### STRICT PRODUCTS LIABILITY
### ABNORMALLY DANGEROUS ACTIVITY

283. Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

284. This Claim is brought under Maryland law by the Personal Injury Plaintiffs, Medical Monitoring Plaintiffs, and Property Damage Plaintiffs (collectively, "Plaintiffs").

285. Gore's manufacturing processes and negligent, reckless, and/or intentional handling of PFOA solution, APFO, and/or PFOA constituted an abnormally dangerous activity for which Gore is strictly liable.

286. Gore's use and disposal of PFOA solution, APFO, PFOA, or other waste containing PFOA, as described herein, was inappropriate for the place where it was carried out, especially given the close proximity of Gore's subject Facilities to Maryland residents, schools, neighborhoods, churches and retail establishments, among other public and private properties, and to source of drinking water relied upon by residents of Elkton and those utilizing its schools, neighborhoods, churches and retail establishments, among other public and private properties.

287. Furthermore, Gore's use and disposal of PFOA, and reckless disregard for the consequences of those actions, carried a high degree of risk of harm to others and a likelihood that any such harm would be great.

288. As a result of Gore's abnormally dangerous activities, Plaintiffs have suffered harm to their property and have suffered and continue to suffer injuries to their bodies and have been forced to mitigate damages as set forth herein, as well as below.

**COUNT II**
**NEGLIGENCE**

289. Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

290. This Claim is brought under Maryland law by the Personal Injury, the Medical Monitoring Plaintiffs, and the Property Damage Plaintiffs (collectively, "Plaintiffs").

291. Gore knew or should have known that PFOA, APFO, and PTFE dispersions containing PFOA that were used in the manufacturing processes at Gore's subject Facilities would result in the release of PFOA and APFO into the environment, the contamination of the

groundwater, ingestion of the groundwater by the community of Cherry Hill and Elkton, accumulation of PFOA and APFO in the bodies of members of those communities, including Plaintiffs and, and adverse health effects to those people, including Plaintiffs.

292. Gore knew or should have known that use of PFOA, APFO, and PFOA containing PTFE dispersions and/or the discharge of PFOA and APFO into the air, ground and sewer system was potentially hazardous to human health and the environment and required Defendant to take adequate safety precautions to ensure that PFOA and APFO were not released into the surrounding environment.

293. Gore further knew or should have known that it was unsafe and/or unreasonably dangerous to emit large amounts of APFO which affected the air, water, and soil in and around the Gore subject Facilities and the respective surrounding Cecil County, Maryland communities.

294. Gore further knew or should have known that it was unsafe and/or unreasonably dangerous to use APFO aqueous dispersions and PTFE powders to make ePTFE films and other consumer products, which Gore did since at least 1980.

295. Gore further knew or should have known that the amount of APFO it emitted was unsafe and/or unreasonably dangerous to the Plaintiffs, and the surrounding community.

296. Gore further knew or should have known that it was unsafe and/or unreasonably dangerous to permit PFOA and APFO to be emitted without adequate control measures.

297. At some point in time after use of PFOA at the Gore's subject Facilities began, either based upon information provided by other PFAS manufacturers, or through published and available literature, Gore knew or should have known of the environmental risks and health hazards associated with human exposure to PFOA and APFO.

298. Gore had a duty to take all reasonable measures to ensure that PFOA, APFO, and/or any PFOA-containing PTFE dispersions would be effectively contained and not discharged into the surrounding environment.

299. Gore further had a duty to ensure that the manufacturing processes it chose to employ did not unreasonably endanger the drinking water relied upon by the residents of Elkton, including the Plaintiffs, and the surrounding area.

300. Gore breached the above-stated duties by unreasonably disposing of PFOA and/or APFO in a manner that guaranteed PFOA would enter the environment, including the groundwater ingested by residents of the Elkton, MD community, including the Plaintiffs.

301. Gore had a duty to warn users of the PFOA-containing products of the dangers of releasing PFOA into the environment and breached that duty by failing to disclose information they possessed about the health hazards associated with PFOA exposure, the propensity of PFOA to cause environmental contamination of air, soil and drinking water, and the bioaccumulation of PFOA in people who are exposed to PFOA.

302. Gore further breached its continuing duties to warn about the dangers of PFOA learned after the purchase of PFOA and PFOA-containing products.

303. Gore breached the above-stated duties by failing to adequately warn and provide sufficient instructions to foreseeable users of PFOA and its PFOA-containing products, including employees handling and disposing of same at Gore's Subject Facilities, to avoid discharging PFOA into the environment where it was likely to enter the groundwater and be ingested by residents of the Elkton, MD community, such as the Plaintiffs.

304. Had Gore provided adequate warnings and instructions of the known health hazards and risk of environmental contamination of PFOA and PFOA-containing products to users,

governmental agencies and the public, it is more likely than not that the injuries and damages of Plaintiffs would not have occurred or would have been lessened as actions would have been taken to reduce or eliminate Plaintiffs' exposure to PFOA.

305. As a result of Gore's breaches of the various duties set forth above, the drinking water in and around Elkton, Maryland became contaminated with unsafe levels of PFOA which was ingested by Plaintiffs.

306. Upon information and belief, Gore was grossly negligent, acted with Reckless indifference to the health and safety of the public, and/or failed to prevent PFOA from being released into the environment and failed to inform the Town of Elkton, the residents of the Elkton, the MD community, or the public of the potential that PFOA was contaminating its water supply.

307. As a direct and proximate result of Gore's actions and omissions described herein, Plaintiffs have suffered illnesses and injuries caused by the accumulation of PFOA in their bodies, entitling them to economic and non-economic compensatory and consequential damages, including the past, present and future cost of medical care; lost earnings and diminished earnings capacity; the cost of medical monitoring; the loss of property value; and severe mental anguish and psychological distress.

**COUNT III**
**PRIVATE NUISANCE**

308. Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

309. This Claim is brought under Maryland law by the Property Damage Plaintiffs.

310. Gore, through its negligent, reckless and/or intentional and unreasonable acts and omissions alleged herein, has contaminated the Property Damage Plaintiffs' groundwater supply, including that accessed through private wells. The manufacture, use, mishandling, and disposal

of material that contained PFAS at Gore's Facilities was inappropriate, given PFAS' toxicity and danger to human health, and due to the proximity of the Facilities to the sources of drinking water wells and residences.

311. Gore exercised sufficient ownership and/or control over its facilities and dumpsites and could have prevented the injuries suffered by the Property Damage Plaintiffs by preventing release of PFAS.

312. Through Gore's control over the operation of its facilities, handling and disposal of its toxic waste, and the maintenance of its toxic waste disposal sites, Gore released toxic substances, including PFAS, into the environment. These toxic substances, including PFAS, eventually migrated and contaminated the Property Damage Plaintiffs' residential properties and drinking water supplies and wells.

313. These toxic substances are invasive and have substantially interfered with the Property Damage Plaintiffs' use and enjoyment of their properties, reduced their property values, and caused them to suffer monetary damages associated with monitoring and remediation of their water supplies.

314. Gore, aware of the adverse effects of these chemicals, had a duty to prevent the discharge of such toxic chemicals into the environment, as well as to prevent the toxic chemicals from escaping from the disposal sites into the Property Damage Plaintiffs' well water.

315. Gore owed a duty to take all reasonable and necessary care to prevent the Property Damage Plaintiffs' properties from becoming contaminated with dangerous PFAS chemicals.

316. The Property Damage Plaintiffs did not consent to the invasion of toxic chemicals into their properties.

317. The Property Damage Plaintiffs have property rights and privileges with respect to the use and enjoyment of their property, including, but not limited to, the right to properties which are not contaminated with harmful chemicals and substances.

318. Gore owed a duty to proceed with all reasonable and necessary care to prevent the Property Damage Plaintiffs' properties from becoming contaminated with dangerous PFAS chemicals.

319. The wrongful actions of Gore in causing PFOA and other PFAS chemicals to contaminate the Property Damage Plaintiffs' properties, and failure to disclose the presence thereof, created a substantial interference with the use and enjoyment of, and physical harm to, the Property Damage Plaintiffs' properties.

320. The contamination of the Property Damage Plaintiffs' properties has interfered with their right to use and enjoy their properties. Indeed, this interference is substantial in nature and has caused significant harm. This contamination has:

a. Required changes to the Property Damage Plaintiffs' water consumption habits such as purchase of bottled water, reduced use of well water, need for installation of filtration systems and/or for connection to public water supplies in lieu or private water.

b. Caused the Property Damage Plaintiffs to refrain from using water to drink, cook, bathe, and all other household purposes, which has, in turn, caused them significant inconvenience and expense;

c. Restricted the Property Damage Plaintiffs' ability to engage in outdoor activities on their properties such as gardening, landscaping, home and vehicle maintenance, sport, outdoor games, and other recreational activities involving interacting with the water, soil and air which may be contaminated;

d. Reduced the Property Damage Plaintiffs' ability to use their homes for social gathering and other events where guests may be exposed to contamination;

e. Reduced the Property Damage Plaintiffs' property value, reducing the amount of equity which the Property Damage Plaintiffs have accrued in their homes and lessening their ability to generate funds through sale or rental of their

properties, or through home equity loans, mortgages or other financial means to extract value from their property;

f. Caused the Property Damage Plaintiffs to suffer monetary damages associated with monitoring and remediation of their water supplies;

g. Created a disturbance in the comfort and/or conveniences of the properties' occupants, including harming their peace of mind and presenting a constant threat of the Property Damage Plaintiffs as well as their family and friends, developing a future injury as a result of their exposure to PFAS. That ongoing harm to the Property Damage Plaintiffs' mental health interferes with the Property Damage Plaintiffs' enjoyment of their homes, impacting their lives on an ongoing basis.

321. The interference with the Property Damage Plaintiffs' properties has occurred within and continues during the three years preceding the filing of this Complaint, and continues to present.

322. Gore's negligent, reckless and/or intentional acts and omissions and interference with the Property Damage Plaintiffs' use and enjoyment of their properties were and continue to be substantial and unreasonable.

323. Gore's substantial and unreasonable interference with the Property Damage Plaintiffs' use and enjoyment of their properties constitutes a nuisance for which Gore is liable.

**<u>COUNT IV</u>**
**TRESPASS**

324. Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

325. This Claim is brought under Maryland law by the Property Damage Plaintiffs.

326. PFAS, including but not limited to PFOA, are harmful and noxious substances.

327. At a minimum, Gore had some connection with and some control over the release of PFOA and other PFAS into the air and water in and around the Property Damage Plaintiffs' real properties.

328. The Property Damage Plaintiffs each own, occupy, and/or possess real property in and around the affected area.

329. Through Gore's negligent, reckless, and/or intentional conduct described above, it has caused PFOA and PFAS to enter onto the real properties owned, occupied, and/or possessed by the Property Damage Plaintiffs in that said real properties are contaminated with PFOA and other PFAS chemicals.

330. The trespass into the Property Damage Plaintiffs' properties has interfered with their right to use and enjoy their properties. Indeed, this interference is substantial in nature and has caused significant harm. This contamination has:

a. Required changes to the Property Damage Plaintiffs' water consumption habits such as purchase of bottled water, reduced use of well water, need for installation of filtration systems and/or for connection to public water supplies in lieu or private water.

b. Caused the Property Damage Plaintiffs to refrain from using water to drink, cook, bathe, and all other household purposes, which has, in turn, caused them significant inconvenience and expense;

c. Restricted the Property Damage Plaintiffs' ability to engage in outdoor activities on their properties such as gardening, landscaping, home and vehicle maintenance, sport, outdoor games, and other recreational activities involving interacting with the water, soil and air which may be contaminated;

d. Reduced the Property Damage Plaintiffs' ability to use their homes for social gathering and other events where guests may be exposed to contamination;

e. Reduced the Property Damage Plaintiffs' property value, reducing the amount of equity which the Property Damage Plaintiffs have accrued in their homes and lessening their ability to generate funds through sale or rental of their properties, or through home equity loans, mortgages or other financial means to extract value from their property;

f. Caused the Property Damage Plaintiffs to suffer monetary damages associated with monitoring and remediation of their water supplies;

g. Created a disturbance in the comfort and/or conveniences of the properties' occupants, including harming their peace of mind and presenting a constant threat of the Property Damage Plaintiffs, as well as their family and friends,

> developing a future injury as a result of their exposure to PFAS. That ongoing harm to the Property Damage Plaintiffs' mental health interferes with the Property Damage Plaintiffs' enjoyment of their homes, impacting their lives on an ongoing basis.

331. The entry and deposit of PFOA and other PFAS chemicals onto said real properties of the Property Damage Plaintiffs by Gore was done without the authority, permission and/or consent of the Property Damage Plaintiffs.

332. Gore's entry and deposit of PFOA and other PFAS chemicals onto said real properties of the Property Damage Plaintiffs has proximately caused the Property Damage Plaintiffs to suffer damages.

## PUNITIVE DAMAGES
### Outrageous, Willful, Wanton, Conscious and Deliberate Conduct With Actual Malice and Intentional Disregard of Harm

333. Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

334. This Claim is brought under Maryland law by the Personal Injury, the Medical Monitoring Plaintiffs, and the Property Damage Plaintiffs (collectively, "Plaintiffs").

335. The conduct of Gore as described above and herein was and is outrageous, willful and wanton. The conduct of the Gore was undertaken with actual malice, and a conscious, deliberate and intentional disregard for Plaintiffs' lives. This conduct was the direct and proximate cause of Plaintiffs' injuries and damages.

336. Gore had actual knowledge, knew and fully understood the toxicity and danger to human life caused by APFO/PFOA at all times by its production and dispersion activities. Armed with that actual knowledge of the toxicity and danger of APFO/PFOA, for over a decade, Gore continued to utilize it in production and disperse it into the environment.

337. Gore knew that its production of PTFE and ePTFE required utilization and processing of the same involved APFO, and APFO dispersions, and that its processing operations included substantial air emissions of PFOA into Elkton and the surrounding community, causing serious injuries to the individuals within it, including the Plaintiffs, yet intentionally, and in bad faith, chose to continue production of its hazardous substances, emitting hazardous substances into the community to incur substantial profit. Gore did this with conscious, deliberate, and intentional disregard for the serious harm to individuals, including the Plaintiffs in Elkton, MD and the surrounding community and with conscious, deliberate and intentional disregard for human life. Gore did so with the express "evil motive" to place profit above human life.

338. Gore knew that dumping effluent from the production of PTFE and ePTFE utilizing APFO/PFOA would cause serious injury to individuals, including Plaintiffs in Elkton, MD and the surrounding community who consumed water from the wells therein, Gore did this with conscious, deliberate and intentional disregard for human life, and with the express "evil motive" to place profit above human life.

339. Gore knew that medical monitoring was advised at the high levels of PFOA exposure it had subjected Plaintiffs to, and that informing Plaintiffs of their exposure could help identify and prevent injuries and illnesses and allow them to treat said injuries and illnesses so as to save their lives and/or prevent their illnesses from increasing in danger and severity. Despite this knowledge, Gore chose to conceal Plaintiffs toxic environmental exposures for over a decade, rather than inform Plaintiffs of same so that they could take the appropriate health monitoring precautions. Gore did this with conscious, deliberate and intentional disregard for human life, and with the express "evil motive" to place profit above human life.

340. Gore concealed the toxicity of APFO/PFOA, its use of the toxic substance in its processing operations of PTFE, ePTFE, its air emissions containing the toxic substances, and its dumping of toxic substances, for over a decade, in order to defraud the victims of its punitive conduct, including Plaintiffs, so as to avoid financial responsibility, and worse, to avoid changing its profitable operations to prevent continued harm to human life.

341. Gore did this in direct contradiction to Maryland's Air Toxics Regulatory framework, the ACGIH 1995 TLV, and numerous studies on the toxicity of APFO/PFOA, of which they were, at all times, intimately aware.

342. Moreover, upon information and belief, Gore employees were directed to destroy or "purge" documents with substantive information on its APFO/PFOA usage; this was done shortly after being made aware of the conclusion of similar PFAS litigation in another state.

343. As a direct and proximate result of Gore's past and continuing, outrageous, willful, wanton, conscious, deliberate and intentional placement of its own financial interests over Plaintiffs' lives, Plaintiffs have suffered and continue to suffer damages as set forth herein.

## RELIEF SOUGHT BY PLAINTIFFS

344. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

345. Plaintiffs have sustained and will continue to sustain damages to their property and/or health as a result of Gore's actions. As a result, Plaintiffs seek monetary damages for each violation set forth in this Complaint.

346. The Personal injury Plaintiffs seek monetary damages to compensate them for pain and suffering and loss of quality of life caused by Gore's conduct.

347. The Property Damage Plaintiffs seek monetary damages to compensate them for the diminution in value of their property caused by Gore's conduct.

348. The Property Damage Plaintiffs seek monetary damages to compensate them for the loss of the use and enjoyment of their properties caused by Gore's conduct.

349. The Medical Monitoring Plaintiffs seek consequential damages sufficient to fund a medical monitoring program that is reasonably tailored to the exposure risks posed by PFOA to the Medical Monitoring Plaintiffs.

350. In addition to the above, the Medical Monitoring Plaintiffs seek injunctive relief to establish a biomonitoring protocol to monitor their health and diagnose at an early stage any ailments associated with exposure, inhalation or ingestion of PFOA.

351. Further, because Gore's acts were done maliciously, oppressively, deliberately, and in reckless disregard of Plaintiffs, Gore's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

352. Leave to amend this Complaint to conform to the evidence produced at trial.

353. For all other relief as may be appropriate under the circumstances and/or permitted by law or as the Court deems just and proper, whether compensatory, punitive, or declaratory.

## **JURY DEMAND**

Plaintiffs demand a trial by jury of any and all issues in this matter.

Dated: April 23, 2026

Respectfully submitted,

*/s/ Andrew W. Croner*
Andrew W. Croner (MD # 1512140003)
Nicholas H. Mindicino, Esq.
*(Pro Hac Vice Forthcoming)*
**NAPOLI SHKOLNIK PLLC**
360 Lexington Avenue, Floor 11
New York NY 10017
Tel. (212) 397-1000
Fax. (646) 843-7603
acroner@napolilaw.com
nmindicino@napolilaw.com

Paul J. Napoli, Esq.
*(Pro Hac Vice Forthcoming)*
**NS PR LAW SERVICES LLC**
**d/b/a NAPOLI SHKOLNIK**
1302 Avenida Ponce de León
San Juan PR 00907-3982
Tel. (833) 271-4502
Fax. (646) 843-7603
pnapoli@nsprlaw.com